Dominic J. Picca
LisaMarie Collins
MINTZ LEVIN COHN FERRIS
GLOVSKY and POPEO, P.C.
666 Third Avenue
New York, New York 10017
(212) 935-3000

*Attorney for Plaintiff Philips Medical Systems MR, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------

PHILIPS MEDICAL SYSTEMS MR, INC.                Civil Action No.:

                              Plaintiff,

    v.                                                            **COMPLAINT**

CONTINENTAL DISC CORPORATION

                              Defendant.

-------------------------------------------------------------

      Plaintiff Philips Medical Systems MR, Inc. ("Philips" or "Plaintiff"), by its attorneys,

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., as and for its Complaint against

Continental Disc Corporation ("CDC" or "Defendant"), alleges as follows:

### NATURE OF THE ACTION

      1.      CDC made defective products that caused damages to Philips.  More specifically,

CDC manufactured and sold defective stainless steel 3" rupture discs (also referred to as "burst

discs").  Those discs were used by Philips as a safety related component in the superconducting

magnets manufactured by Philips and used in the MRI machines (or "MRI systems") that were in

turn sold to clinical customers globally.  CDC misrepresented to Philips that its rupture discs

would burst at 9.6 pounds per square inch gauge ("PSIG"), plus or minus 1.0 PSIG.  Also, CDC

certified that the rupture discs it provided to Philips conformed to the strict specifications set-forth in the contract and required by Philips.  Philips relied on CDC's representations in manufacturing its superconducting magnets used in MRI systems sold to hospitals, clinics, outpatient imaging centers and the like around the world.

2.       But the CDC rupture discs were defective and suffered from serious design and manufacturing errors.  Specifically, in November 2017, Philips learned that a rupture disc had failed to appropriately rupture in the field, posing a safety risk due to a large volume of helium gas entering the MRI examination room as opposed to safely exhausting through the vent pipe to atmosphere external to the building.  When helium gas enters the examination room there is a potential for harm to human life due to oxygen displacement and potential asphyxiation (i.e. suffocation).  Philips immediately began an investigation and post-market risk assessment according to quality procedures.  Subsequent testing by both Philips and CDC confirmed that over half of the rupture discs tested and supplied by CDC did not comply with the strict specifications required by Philips.  Therefore, in the interest of safety, Philips had no reasonable choice but to have an international recall issued (or "Field Change Order" or "FCO") resulting in an initial estimated direct cost to Philips of more than $6 million.  The FCO is currently ongoing and the final direct costs may be lower than the initial estimate due to efficiencies developed by Philips during the course of conducting the FCO.  The final direct cost to Philips will be proven at trial.

3.       In sum, the defects in CDC's rupture discs caused substantial direct damages to Philips by causing an international recall to be initiated and conducted to replace the CDC-manufactured rupture discs.  Accordingly, Philips asserts claims for fraudulent inducement, negligent misrepresentation, fraudulent/intentional misrepresentation, breach of contract, breach

of implied warranty of merchantability, breach of implied warranty of fitness for a particular

purpose, breach of express warranty, breach of covenant of good faith and fair dealing, and

negligence.  Philips seeks compensatory, consequential, incidental, and punitive damages, and its

attorneys' fees and costs in connection with this proceeding.

## THE PARTIES

4.     Plaintiff Philips is a corporation organized under the laws of the state of

Delaware, with a principal place of business at 450 Old Niskayuna Road in Latham, New York.

5.     Defendant CDC is a corporation organized under the laws of the state of Missouri,

with a principal place of business at 3160 West Heartland Drive in Liberty, Missouri.

## JURISDICTION AND VENUE

6.     The amount in controversy in this action exceeds the sum of $75,000, exclusive of

interest and costs.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332,

based on the diversity of citizenship of the parties and the amount in controversy.

7.     This Court also has jurisdiction over this action by virtue of ¶ 23.9 of the "Philips

General Conditions of Purchase" accompanying the applicable Purchase Orders, which states

that "[a]ny and all disputes arising out of, or in connection with this Agreement will be settled by

the competent state courts in New York, New York or federal courts in the Southern District of

New York."  Furthermore, CDC contracted with Philips, a New York based company, to sell

rupture discs to Philips and shipped the goods to New York pursuant to the contract.

8.     Venue is properly in this District pursuant to 28 U.S.C. §§ 1391(a) and (c) and by

virtue of ¶ 23.9 of the "Philips General Conditions of Purchase" accompanying the applicable

Purchase Orders, which states that "[a]ny and all disputes arising out of, or in connection with

this Agreement will be settled by the competent state courts in New York, New York or federal courts in the Southern District of New York."

## FACTUAL BACKGROUND

### Background on MRI Systems, Superconducting Magnets, Quenches, and Rupture Discs

9.      Since 1965, CDC has been a manufacturer of rupture discs for use in a variety of process industries, including chemical, petrochemical, petroleum refining, pharmaceutical, food and beverage, aerospace, industrial gases, transportation, and other markets worldwide.

10.     As of March 2015, CDC represented that it had more than two thousand active customers representing all segments of the economy.

11.     Rupture discs function as a pre-designed "weak point" in a pressurized system and serve as a safety device in the MRI systems.

12.     Philips is a leading global provider of superconducting magnets that are used in magnetic resonance imaging ("MRI") systems worldwide. As a key part of its MRI business, Philips, by its affiliate, Philips Medical Systems Nederland B.V., designs, manufactures, and sells MRI systems to customers around the world.  MRI systems are indicated for human use as medical diagnostic imaging devices.  The MRI systems are non-invasive imaging systems that can produce cross-sectional images, spectroscopic images and/or spectra in any orientation of the internal structure of the head, body, or extremities with exquisite soft tissue contrast and without ionizing radiation.  They are an important medical diagnostic tool in healthcare systems around the world.  MRI systems consist of an arrangement of several components, including a superconducting magnet that produces the required high strength magnetic field.

13.     Maintenance of the superconductive coil below a so-called critical temperature is done by the liquid helium bath in which the superconducting coil resides.  Liquid helium is

extremely cold and is used to cool the superconductive magnets in MRI systems, enabling them to operate at a high magnetic field strength.  The magnet is composed of superconductive coil windings that reside in a vessel that contains the liquid helium.  The vessel is surrounded by a cryostat structure to reduce heat load to the helium vessel and a refrigeration unit maintains the liquid helium.  Such MRI magnet cooling systems are pressure vessels and require the use of rupture discs.

14.    A "quench" is a commonly known phenomenon that is specific for superconducting coils and occurs from time to time in superconductive magnets.  When a quench occurs, the superconducting wire transitions to a resistive state and the energy stored in the magnetic field is converted to heat and taken up by the liquid helium cooling the magnet.  The liquid helium is rapidly converted to an enormous volume of gaseous helium.  The rupture disc is intended to rupture and allow the safe flow of helium gas through a connected vent system to outside atmosphere external to the building.

15.    Initiation of a quench is caused by an internal thermal disturbance of any nature, for example, small wire motion, epoxy stress relief, flux jumps, or forced quench in an emergency situation.  All of these can cause the quench, but a quench should not cause any permanent damage to the overall magnets operation or helium gas to enter the examination room if the resulting helium gas is properly vented.

16.    Recovery of the coil to the superconductive state will occur only after the stored energy of the coil has been dissipated and the coil has been cooled back down to below critical temperature again and the magnet then energized back to field with an external power supply.

17.    Since it is not possible to completely avoid the occurrence of quenches in superconducting magnets, measures have been designed into the magnet structure in order to

enable the superconductive coil to survive a quench with no short or long-term functional deficiencies.

18.     In the event of a magnet quench, a rupture disc should rupture at the specified pressure in order to allow the evaporating helium resulting from the quench to safely escape via the vent pipe to outside the hospital or building housing the examination room.  Essentially, rupture discs are a safety mechanism in the event of a superconducting magnet quench.

19.     Absent appropriate and functioning safety systems, helium gas could escape into the examination room when superconductivity is lost (also known as quenching of the magnet) and at the same time, the designed helium ventilation path is impeded or blocked (i.e. a catastrophic failure of the helium pressure relief system). This causes the magnet vessel to over-pressurize and rupture and release the helium gas into the examination room.  In this instance, a high concentration of helium gas may penetrate quickly into the examination room, which will be visible as clouds of cold mist.  If this situation occurs, the patient and personnel must immediately be evacuated from the examination room.

20.     Helium gas can displace oxygen necessary for breathing in confined or poorly ventilated areas.  Helium gas cannot be detected by human senses.  Helium gas is odorless, colorless, and tasteless.  In large enough concentration, helium gas will cause unconsciousness and possibly death due to lack of oxygen.

21.     A non-conforming, defective rupture disc in an MRI system poses a serious safety risk as it can cause or contribute to a death or serious injury.  When a rupture disc does not perform as intended in an MRI system, there is an increased and unacceptable risk of helium gas entering the patient examination room due to over pressure of the helium vessel, and therefore an associated increased and unacceptable risk of asphyxiation/suffocation.

22.    The following is an image of a rupture disc:



23.    The following is an image of a rupture disc inserted into a magnet and it also identifies the location of the vent pipe and siphon port cap:



**Philips Contracts With CDC To Purchase Rupture Discs Designed By CDC To Meet Philips' Strict Specifications For Use In MRI Systems**

24.    Defendant CDC engages in the design, manufacture, and sale of standard and custom rupture discs for use in many industries and products.

25.    Philips historically has used graphite rupture discs supplied by another manufacturer—not CDC—for its MRI systems.  Helium is scarce and expensive, and a drawback of graphite rupture discs is they are more porous than metal and allow some gas leakage over time.

26.    In 2014, Philips approached CDC to inquire about the possibility of designing a metal rupture disc for use in its MRI systems that would meet Philips' requirements.  CDC designed a stainless steel rupture disc that it represented would meet Philips' strict specifications for use in the MRI systems, including specifically a burst pressure range of 9.6 PSIG (plus or minus 1.0 PSIG).

27.    On or around March 12, 2015, three Philips employees traveled to CDC to meet with four CDC representatives, including Mitch Berry who was CDC's sales manager at the time.  The Parties spent considerable time discussing the proposed 3" rupture disc design being contemplated.  Many details were discussed and a general agreement was reached on a path forward.  The CDC employees at that meeting represented to Philips that (a) any damage to the rupture discs would likely result in lower burst levels, (b) improperly installed rupture discs could reduce burst pressure, and (c) that a "ding" in the rupture disc could reduce the burst pressure by 30-40%.

28.    CDC represented to Philips that CDC conducted testing to determine the feasibility of meeting Philips' requirements for burst pressure range (9.6 PSIG, plus or minus 1.0 PSIG).  CDC produced over 100 rupture discs using 316 Stainless Steel material, and the results of this phase of testing, according to CDC in July 2015, were "very favorable."  Based on these results, CDC designed the concept for the finished rupture discs.

29.     CDC designed the 3" rupture disc with a Safety Ratio of 1 to 1 or less.  This means that if a rupture disc becomes damaged, it will relieve at or below its designed burst pressure.  Typically a damaged disc will retain 60 to 70% of the rupture pressure.

30.     On or about September 15, 2015, Philips issued a purchase order (the "September Purchase Order") to CDC offering to purchase, among other items, one thousand 3" diameter rupture discs (part number 4598-007-53261, assembly 4598-008-84671) to be manufactured in compliance with strict specifications set-forth in DMR210923, assembly DMR233866.  Philips required that CDC provide a certificate of compliance for these rupture discs.

31.     The September Purchase Order stated that "All transactions for the purchase of goods and/or services by any Philips company for the Philips Healthcare sector are subject to the Philips General Conditions of Purchase, for BOM Purchases, and all other purchases as in effect on the date of our order." The September Purchase Order further stated that "The Philips General Conditions of Purchase are subject to change from time to time and can be found and reviewed on the following webpage:

http://www.philips.com/about/company/businesses/suppliers/generalconditionsofpurchase/index/page.

32.     The Philips General Conditions of Purchase in effect at that time was the April 2015 version.  Philips General Conditions of Purchase ¶ 2.1 stated: "These General Conditions of Purchase, together with the relevant Purchase Order issued by Philips, set forth the terms under which Philips' offers to purchase Goods and/or Services from Supplier.  When Supplier accepts Philips' offer, either by acknowledgement, delivery of any goods, and or commencement of performance of any Services, a binding contract shall be formed."

33.    The Philips General Conditions of Purchase ¶ 2.2 further stated: "Philips is not bound by and hereby expressly rejects Supplier's general conditions of sale and any additional or different terms or provisions that may appear on any proposal, quotation, price list, acknowledgment, invoice, packing slip or the like used by Supplier.  Course of performance, course of dealing, and usage of trade shall not be applied to modify these General Conditions of Purchase."

34.    By accepting the Philips General Conditions of Purchase, as stated in ¶ 9.1 of that document, CDC represented and warranted that the rupture discs would be "suitable for the intended purpose and shall be new, merchantable, of good quality and free from all defects in design, materials, construction and workmanship."  CDC further represented and warranted that the rupture discs would "strictly comply with the specifications, approved samples and all other requirements under the Agreement."

35.    Section 9.2 of the Philips General Conditions of Purchase further stated: "These warranties are not exhaustive and shall not be deemed to exclude any warranties set by law, Supplier's standard warranties or other rights or warranties which Philips may be entitled to. These warranties shall survive any delivery, inspection, acceptance, payment or resale of the Goods, and shall extend to Philips and its customers. Acceptance of, or payment for, all or any part of the Goods or Services furnished under the Agreement shall not be deemed to be a waiver of Philips' right to cancel or return or reject all or any part thereof because of a failure to conform to order or by reason of defects, latent, or patent, or other breach of warranties, or to make any claim for damages, including manufacturing costs and loss of profits or other special damages incurred by Philips."

36.    Section 11.2 of Philips General Conditions of Purchase stated: "Supplier shall bear all cost of repair, replacement and transportation of the nonconforming Goods, and shall reimburse Philips in respect of all costs and expenses (including without limitation, inspection, handling, and storage costs) reasonably incurred by Philips in connection therewith."

37.    Five business days after Philips issued its offer to purchase the rupture discs, on September 23, 2015, CDC entered the September Purchase Order into its system.

38.    On December 18, 2015, CDC shipped one hundred of the thousand rupture discs to Philips.  CDC included in its shipment to Philips an invoice for the goods, which stated the rupture discs were rated at 9.6 PSIG.   CDC also included a Certificate of Compliance that stated the rupture discs complied with the 9.6 PSIG requirement specified by Philips.  The Certificate of Compliance stated that the Safety Ratio Burst Test was "Equal to or less than 1 to 1."  The same representations, certifications, and instructions described below were included in each shipment to Philips related to the additional purchase orders.  Philips relied on these certifications and representations in the manufacture of its superconducting magnets. CDC also attached to its invoices a copy of CDC's General Terms and Conditions.

39.    CDC provided Philips with instructions and warnings for its rupture discs. In a document entitled "Preparation and Installation of the Special 3" Welded HPX® (FS) Disc Assembly Per CD 31769 (CONCEPT)" (the "Instructions"), CDC warned that "THERE IS NO GUARANTEE OF RUPTURE DISC LIFE.  SUCH LIFE SPAN IS AFFECTED BY CORROSION, CREEP AND FATIGUE AND PHYSICAL DAMAGE.  THESE CONDITIONS WILL DERATE THE RUPTURE DISC TO A LOWER SET PRESSURE."  In other words, CDC warned Philips that the rupture discs would burst at a *lower* level with age.  The Instructions similarly further warned "**IF THE RUPTURE DISC ASSEMBLY IS NOT**

**REPLACED PERIODICALLY WHEN EXPOSED TO THESE CONDITIONS, PREMATURE FAILURE OF THE RUPTURE DISC ASSEMBLY MAY OCCUR, THEREBY DISCHARGING THE PROCESS MEDIA.**"

40.     The Instructions further warn that "PROPER INSTALLATION OF A RUPTURE DISC IS CRITICAL TO PERFORMANCE AND SAFETY.  FAILURE TO PROVIDE PROPER SEATING OF A RUPTURE DISC MAY AFFECT RUPTURE DISC PERFORMANCE, BURST PRESSURE ACCURACY, AND MAY RESULT IN ITS PREMATURE FAILURE."  Again, in other words, CDC warned Philips that the rupture discs would burst at a *lower* level if installed improperly.

41.     The Instructions further warned that "CARE MUST BE USED IN A FACILITY'S DESIGN TO PROTECT BOTH THE RUPTURE DISC FROM INADVERTENT DAMAGE WHICH COULD CAUSE ITS PREMATURE RELEASE AND TO PROTECT INDIVIDUALS EXPOSED TO HAZARDS CREATED BY SUCH SUDDEN RELEASE."  Again, in other words, CDC warned Philips that the rupture discs would burst at a *lower* level if inadvertently damaged.

42.     CDC specifically advertises and represents on its website that its rupture discs have "been proven the most reliable in the industry – and the best choice for your operation" and "the most reliable rupture discs on the market."  CDC also specifically advertises and represents on its website that if "[CDC does not] have the perfect solution for your application, [CDC will] engineer and manufacture it" and that "if an existing solution won't work for your application, [CDC] can modify or redesign any of [CDC's] products to match your system – or create a completely custom, one-of-a-kind solution."  CDC further specifically advertises and represents on its website that the "lot of rupture discs will be built to match the exact specifications of your

plant, and then performance and proof-pressure tested at the same overpressure conditions they'll operate in on a daily basis.  [CDC] will ship them only after [CDC is] sure they'll meet and exceed your expectations."

43.    Philips relied on the representations by CDC in entering into a contract with CDC to design, manufacture, and sell to Philips rupture discs that met Philips strict specifications for use in its MRI machines.  As detailed above, the misrepresentations made by CDC that Philips relied on to its detriment include, but are not limited to, the following:

(a)    CDC's representation that it could design a stainless steel rupture disc that would meet Philips' strict specifications;

(b)    CDC's representation that its testing to determine the feasibility of meeting Philips' requirements was "very favorable;"

(c)    CDC's representations at the meeting on March 12, 2015, that rupture discs would burst at lower levels—and thus not pose a safety risk in MRI systems—if damaged, improperly installed, or dinged.

(d)    CDC's representation that the rupture discs were manufactured with a Safety Ratio of 1 to 1 or less;

(e)    CDC's representations in its Certificates of Compliance that the rupture discs met the strict specifications of Philips and were rated at 9.6 PSIG, and that the Safety Ratio Burst Test was equal to or less than 1 to 1;

(f)    CDC's representations in the instructions and warnings for its rupture discs that there is no guarantee of rupture disc life, and that rupture discs would burst at lower levels with age, and would also burst at lower levels if damaged or installed incorrectly;

(g)    CDC's representations on its website that its rupture discs have "been proven the most reliable in the industry" and "will be built to match the exact specifications."

44.    To date, CDC has supplied Philips with approximately 2,750 rupture discs for use in its MRI machines.

## The Rupture Discs Sold to Philips by CDC Were Defective

45.    Notwithstanding the representations made by CDC, its rupture discs were woefully inadequate for the purposes for which Philips intended to use them.

46.    Upon information and belief, CDC knew or should have known that the 3" rupture discs suffered from serious design and/or manufacturing errors that made the rupture discs burst at pressures outside the scope of Philips strict specifications.

47.    Upon information and belief, CDC failed to adequately test the rupture discs for the specific attributes contracted for, namely the level at which the rupture discs would burst.

48.    Based on information and belief, CDC produces rupture discs in lots of around 200 discs at a time.  Destructive samples are done on a few discs out of each lot, and based on such sample tests, the entire lot is either accepted or rejected.  This way of accepting rupture discs gives insufficient control over quality.

49.    The rupture discs were shipped by CDC with materials indicating that each unit conformed with the strict specifications required by Philips and would burst at 9.6 PSIG (plus or minus 1.0 PSIG).  Philips relied on these representations in buying and using the rupture discs.

50.    Despite these representations made by CDC, Philips has determined that the burst pressure for a high percentage of the rupture discs does not comply with the strict specifications set by Philips.

51.     On or about November 23, 2017, a Philips-manufactured NOL Lite magnet quenched in an MRI system at Primus Hospital in India.

52.     During the event at the Primus Hospital, the rupture disc failed to perform its intended function and did not burst, leading to high pressure in the MRI system which caused the helium fill port (also referred to as siphon port) cap to pop off.  As a result, helium filled the examination room, damaging the MRI system and the examination room.  Luckily, there was no harm to human life.

53.     A helium fill port cap, like the one involved in the Primus Hospital event, is expected to be ejected at approximately 30 PSIG.  The maximum vessel pressure if venting only through the fill port is expected to be approximately 138 PSI absolute (approximately 123 PSIG).

54.     During the event at the Primus Hospital, the vacuum drop off plate "dropped", indicating that the helium vessel experienced a rupture.  Helium vessel ruptures are rare.  It is estimated that a pressure greater than 60 PSI absolute (approximately 45 PSIG) is required to initiate rupture of a helium vessel, where the neck bellows portion of the helium vessel would squirm.  This indicates that the rupture disc experienced a pressure of at least 60 PSI absolute (approximately 45 PSIG) without properly performing.  Further evidence indicates that the pressure experienced during the Primus event was approximately 138 PSI absolute (approximately 123 PSIG).   These values are extremely far above the level at which the burst disc is intended to rupture.

55.     As a result of the Primus Hospital incident, Philips conducted a root cause investigation pursuant to the Philips quality management system.  CDC initially participated in this root cause investigation with Philips. Several rounds of testing were performed in support of the root cause investigation.  Based on the results of the testing, Philips determined that a

significant portion of the CDC rupture discs were defective and would not perform their intended function.

56.     Further analysis and testing at Philips and CDC showed that the rupture discs may not rupture at the specified pressure as a result of a production issue related to either CDC's design or manufacturing of the rupture discs.

57.     The Primus Hospital rupture disc was returned to Philips for examination.  The examination concluded that the disc reversed which indicated that the disc was installed in the correct orientation.  However, disc reversal does not mean that the disc burst properly or adequately.  In fact, the disc did not burst at all.

58.     The rupture disc was then returned to CDC for further examination.  Among other findings, the residual material thickness under the score line at the initiator was significantly thicker than a similar disc taken from CDC's production.

59.     Two Philips employees traveled to CDC on December 21, 2017, to discuss the results with CDC and run additional tests while at CDC.  The results of the testing were documented by CDC in Returned Material Report 915090683ARA.  From this testing, the only parameters that resulted in characteristics similar to the Primus disc were reduced score depth.

60.     On February 19, 2018, additional testing was conducted at CDC.  Six rupture discs from lot 8286690A—the same lot as the Primus disc—were returned from the field. Two of the discs were from Japan and four were from China.  All of the discs were evaluated using White Light Interferometry (WLI) to measure the score depth near the initiator by a third-party vendor, Lucideon.  The rupture discs were also tested using a ball micrometer to measure sheet material thickness near the initiator by HJM, a third-party calibration lab. The rupture discs were also tested using WLI to measure the score depth near the initiator by CDC.  These three tests are

non-destructive.  Lastly, the rupture discs were pressurized to burst at CDC using CDC's production equipment.  This last test is destructive.

61.    On February 19, 2018, four of the six rupture discs did not rupture within the design pressure range of 9.6 PSIG, plus or minus 1.0 PSIG.  In the cases where the discs did not perform as intended, one rupture disc burst at 84 PSIG and another burst at 10.7 PSIG.  The other two rupture discs did not open and were stopped at 99 PSIG due to test equipment conditions.  On February 20, 2018, the two rupture discs were taken to failure and burst at 303 PSIG and 165 PSIG.  These results were far above the expected burst pressure level and demonstrated a significant and serious safety issue. This testing was witnessed by approximately eight CDC employees and two Philips employees.

62.    Additional testing has been performed by CDC on seven other lots of rupture discs that CDC provided to Philips. CDC's own testing demonstrates that *over half* of the 173 discs tested to date do not comply with Philips strict specifications concerning burst pressure. Across the eight lots tested by CDC, the median PSIG was 10.70 PSIG, which is outside the strict specifications set-forth by Philips.  Additionally, the average PSIG was 13.62 PSIG and the maximum was 303.0 PSIG.  If the Primus lot is not included in this analysis, the median PSI for the seven other lots is 10.70 PSIG, which is outside the strict specifications set-forth by Philips, and the average PSIG is 10.63 PSIG with a maximum PSIG of 19.70 PSIG.  This testing, performed by CDC, demonstrates that the rupture discs provided by CDC to Philips did not comply with the strict specifications required by Philips and were defective.

63.    On or about April 26, 2018, at the Khanh Hoa Hospital in Vietnam, another Philips-manufactured MRI system experienced a magnet quench in which the rupture disc did not properly perform its function and instead failed to burst during a quench.  The rupture disc

involved in the Vietnam incident was from the same lot of rupture discs as the rupture disc involved in the Primus Hospital incident.  No one was injured in the Vietnam incident which occurred in the middle of the night, but there was damage to the examination room and the MRI system.

64.    On March 27, 2018, CDC informed Philips that CDC would stop supplying products to Philips in light of the dispute involving whether CDC's rupture discs complied with the strict specifications required by Philips. At that time, CDC had already accepted an additional offer by Philips to purchase certain rupture discs, thereby forming a contract, and had not yet delivered the goods to Philips.  CDC breached its contract with Philips by not delivering those rupture discs.

65.    On or about July 17, 2018, the Parties executed a tolling agreement to preserve the status quo to explore whether a resolution to this dispute could be achieved without litigation. The Parties were unsuccessful in their efforts and CDC provided written notice ending the tolling agreement on December 19, 2018.  Pursuant to the tolling agreement, the tolling agreement terminated on February 17, 2019.

### Impact of CDC's Defective Product on Philips

66.    Notwithstanding its own testing results, CDC maintains that the rupture discs it provided to Philips are not defective and instead comply with the strict specifications set-forth by Philips.

67.    As a result of CDC's defective rupture discs, Philips has expended substantial personnel and resources, spending time and resources on a root cause investigation, changing rupture disc suppliers, and initiating and implementing an international recall, among other associated costs.

68.    Due to CDC's unilateral decision to stop supplying rupture discs to Philips in May 2018, and in order to continue manufacturing MRI systems, Philips was forced to return to using graphite rupture discs provided by another manufacturer.  Philips incurred additional significant costs associated with the change from stainless steel rupture discs to graphite rupture discs.

69.    Because of the unacceptable risk of harm associated with the defective rupture discs, and the lack of certainty regarding which discs are or are not defective—with no means to discern this information in the field—Philips initiated a recall of the rupture discs and replacement of the rupture discs with compliant rupture discs (a Field Change Order or "FCO").

70.    Philips was forced to incur the costs associated with the FCO in the interest of patient, operator, clinician, and public safety, and the costs are directly related to CDC's failure to supply rupture discs that strictly complied with the specifications required by Philips.

71.    Philips expenditures and damage to its brand resulting from CDC's failure to fully comply with the contract have been substantial and unexpected.

**<u>FIRST CAUSE OF ACTION</u>**
**Fraud in the Inducement**

72.    Plaintiff incorporates the allegations of paragraphs 1 through 71 above as if fully stated herein.

73.    CDC had a duty to provide correct information regarding its products.

74.    Defendant CDC made numerous false representations of material fact, as detailed in ¶¶ 26-29, 34, 38-43, 49, and CDC's representatives knew that the representations of material fact were false at the time they were made.  Alternatively, CDC made its false representations of material fact with reckless disregard to their truth.

75.     These representations were knowingly false when made.  Alternatively, CDC made these misrepresentations of material fact with reckless disregard for the truth thereof.

76.     CDC made these misrepresentations of material fact with the intent to deceive Philips, among others, and with further intent to induce Philips to act on said misrepresentations of material fact, and purchase CDC's rupture discs.

77.     The facts and representations made by CDC via its representatives, on its website, in its marketing materials, and in its certificates of compliance are solely within CDC's knowledge.  Philips did not have the means available to know or, through the exercise of ordinary intelligence, determine the truth of the representations made by CDC.

78.     At the time of placing purchase orders for rupture discs with CDC and when manufacturing its MRI systems, Philips in fact relied on CDC's misrepresentations of material fact, and was damaged as a result thereof in an amount to be determined at trial, but in an amount in excess of $75,000.

## SECOND CAUSE OF ACTION
### Negligent Misrepresentation

79.     Plaintiff incorporates the allegations of paragraphs 1 through 78 above as if fully stated herein.

80.     As further described herein, CDC negligently misrepresented that they could manufacture, or had manufactured, the rupture discs as contemplated by the parties and advertised on their website as detailed in ¶¶ 26-29, 34, 38-43, 49.  Further, CDC negligently misrepresented that the rupture discs complied with the strict specifications set-forth by Philips as detailed in ¶¶ 30, 38, 49.

81.     As further described herein, at the time of placing its purchase orders for rupture discs with CDC and when manufacturing its MRI systems, Philips relied to its detriment on the negligent misrepresentations of CDC.

82.     Philips has suffered and continues to suffer harm and damages as a direct and proximate result of CDC's negligent misrepresentations, and Philips' detrimental reliance thereon.  As a result of CDC's negligent misrepresentations, Philips has been damaged in an amount to be determined at trial, but in an amount in excess of $75,000.

**THIRD CAUSE OF ACTION**
**Fraudulent/Intentional Misrepresentation**

83.     Plaintiff incorporates the allegations of paragraphs 1 through 82 above as if fully stated herein.

84.     As further described herein, CDC intentionally misrepresented that it could manufacture, or had manufactured, the rupture discs, as detailed in ¶¶ ¶¶ 26-29, 34, 38-43, 49.

85.     As further described herein, CDC intentionally misrepresented that they did in fact provide the rupture discs as contemplated and advertised, as detailed in ¶¶ 26-29, 34, 38-43, 49.

86.     As further described herein, at the time of placing purchase orders for rupture discs with CDC and when manufacturing its MRI systems, Philips relied to its detriment on the intentional misrepresentations of CDC.

87.     Philips has suffered and continues to suffer harm and damages as a direct and proximate result of CDC's intentional misrepresentations, and Philips' detrimental reliance thereon.  As a result of CDC's intentional misrepresentations, Philips has been damaged in an amount to be determined at trial, but in an amount in excess of $75,000.

## FOURTH CAUSE OF ACTION
### Breach of Contract

88.    Plaintiff incorporates the allegations of paragraphs 1 through 87 above as if fully stated herein.

89.    The September Purchase Order and the other purchase orders between Philips and CDC formed binding and enforceable contracts.

90.    CDC was well aware of the terms of the contracts and the obligations that were involved.

91.    Philips duly performed all the conditions on its part pursuant to the contracts.

92.    As more fully described herein, CDC breached its contracts with Philips.  This includes, but is not limited to, the September Purchase Order and the outstanding orders in effect at the time CDC informed Philips it would no longer supply Philips with rupture discs as detailed in ¶ 64.

93.    CDC failed to provide the contracted rupture discs as stated in the contracts.

94.    CDC, by its own statements and admissions, has provided rupture discs which do not comply with the strict specifications represented in the contracts.

95.    CDC failed to provide Philips with rupture discs that worked in accordance with Philips' strict specifications, as provided for in the contracts.

96.    As a direct and proximate result of CDC's breaches – including, but not limited to, its failure to provide rupture discs that complied with the strict specifications pursuant to the contract – Philips has suffered and will continue to suffer damages in an amount to be determined at trial, but in an amount in excess of $75,000.

## FIFTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability

97.    Plaintiff incorporates the allegations of paragraphs 1 through 96 above as if fully stated herein.

98.    CDC is a merchant with respect to goods of the kind contracted for via the Purchase Orders.

99.    Pursuant to New York Uniform Commercial Code ("NY U.C.C.") §2-314, any seller of goods impliedly warrants that the goods are merchantable and were fit for the ordinary purposes for which such goods are used.

100.    CDC's rupture discs, as provided to Philips, were not fit for the ordinary purposes for which such devices are used, in that they suffered from serious design, manufacturing, and/or warning deficiencies.

101.    CDC's rupture discs, as provided to Philips, were not of average quality within the industry.

102.    CDC's rupture discs, as provided to Philips, were not of consistent quality.

103.    CDC's rupture discs, as provided to Philips, did not conform to the promises and affirmations of fact made on the labeling/instructions of the products and certificates of conformance as provided to Philips.

104.    CDC thus breached the implied warranty of merchantability.

105.    Philips has and will continue to suffer damages as a direct and proximate result of CDC's breach of the implied warranty of merchantability in an amount to be determined at trial, but in an amount in excess of $75,000.

## SIXTH CAUSE OF ACTION
### Breach of Implied Warranty of Fitness For a Particular Purpose

106.    Plaintiff incorporates the allegations of paragraphs 1 through 105 above as if fully stated herein.

107.    Pursuant to NY U.C.C. §2-315, every seller of goods that has reason to know any particular purpose for which the goods are required and that the buyer is relying on seller's skill or judgment to select or furnish goods, there is an implied warranty that the goods shall be fit for such purpose.

108.    The rupture discs supplied to Philips by CDC were custom designed by CDC to meet Philips requirements for its MRI systems.  CDC knew that the rupture discs would be used in MRI systems.

109.    At the time of the Purchase Orders, CDC had reason to know that Philips intended to use the rupture discs as a safety component in the MRI systems that Philips manufactures, and further had reason to know that Philips was relying on CDC's skill and judgment to design, manufacture, select, or furnish the rupture discs it was selling to Philips.

110.    CDC's rupture discs were not fit for the particular purpose for which Philips purchased it, namely as a safety component for the MRI machines that Philips manufactures.

111.    CDC has thus breached the implied warranty of fitness for a particular purpose, entitling Philips to all damages allowed by law – including consequential damages – in an amount to be determined at trial, but in an amount in excess of $75,000.

## SEVENTH CAUSE OF ACTION
### Breach of Express Warranty

112.    Plaintiff incorporates the allegations of paragraphs 1 through 111 above as if fully stated herein.

113.    Pursuant to NY U.C.C. §2-313(1)(a) , "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

114.    Pursuant to NY U.C.C. §2-313(1)(b) , "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."

115.    Among other things, the contract between Philips and CDC states that CDC represents and warrants that the rupture discs "are suitable for the intended purpose and shall be new, merchantable, of good quality and free from all defects in design, materials, construction, and workmanship" and "strictly comply with all the specifications, approved samples and all other requirements under the Agreement." CDC also provided Philips with Certificates of Compliance certifying that the rupture discs complied with the strict specifications set by Philips.

116.    CDC's rupture discs failed to live up to even the most basic of the representations and descriptions made by CDC as to the rupture discs capabilities.

117.    CDC thus breached the express warranties made about the rupture discs, and as a result has caused Philips damages in an amount to be determined at trial, but in an amount in excess of $75,000.

### EIGHTH CAUSE OF ACTION
**Breach of the Covenant of Good Faith and Fair Dealing**

118.    Plaintiff incorporates the allegations of paragraphs 1 through 117 above as if fully stated herein.

119.    As described more fully herein, CDC knowingly manufactured and/or provided to Philips rupture discs that substantially did not conform with the specifications and descriptions

of the products given to Philips, the promises made to Philips, or the affirmations made to Philips.

120.    After Philips complained regarding the defective rupture discs, and reported the issues to CDC, CDC misrepresented that the products were not defective.

121.    CDC failed to adequately test its own products to ensure that they complied with the specifications and descriptions represented, and failed to use reasonable efforts to investigate the cause of the problems with the defective rupture discs.

122.    To date, CDC continues to misrepresent that the rupture discs are not defective.

123.    As further described herein, CDC willfully and knowingly breached its obligations under the contract.

124.    Philips has suffered and continues to suffer harm as a direct and proximate result of CDC's breach of the covenant of good faith and fair dealing in an amount to be determined at trial, but in an amount in excess of $75,000.

## NINTH CAUSE OF ACTION
### Negligence

125.    Plaintiff incorporates the allegations of paragraphs 1 through 124 above as if fully stated herein.

126.    CDC failed to use reasonable care in the design, manufacture, testing, warnings, and generally the provision of the defective rupture discs to Philips.

127.    As a direct and proximate result of CDC's negligence, Philips was caused to suffer, and continues to suffer, damages in an amount to be determined at trial, but in an amount in excess of $75,000.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Philips prays that this Court grant it the following relief:

A.  Judgment on all Counts of this Complaint;

B.  Compensatory, incidental and consequential damages against CDC pursuant to all applicable Counts of this Complaint;

C.  Punitive damages against CDC pursuant to all applicable Counts of this Complaint;

D.  Attorneys' fees and costs/disbursements against CDC pursuant to all applicable Counts of this Complaint;

E.  Judgment directing CDC to disgorge all monies paid by Philips for the defective rupture discs;

F.  Judgment awarding Philips any and all other rights that flow from CDC's wrongs as alleged herein; and

G.  Any such other relief as the Court may deem just and proper.


Dated:   New York, New York
             February 18, 2019                              Respectfully submitted,

                                                            **MINTZ, LEVIN, COHN, FERRIS
                                                            GLOVSKY and POPEO, P.C.**

                                                            By: *_/s/ Dominic J. Picca_*
                                                                 Dominic J. Picca, Esq.
                                                                 LisaMarie Collins, Esq.
                                                                 The Chrysler Center
                                                                 666 Third Avenue, 25th Floor
                                                                 New York, New York 10017
                                                                 (212) 935-3000
                                                                 DJPicca@mintz.com
                                                                 LFCollins@mintz.com

                                                                 *Attorneys for Plaintiff*